IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MICHAEL DAVID JOLLEY                                                    PLAINTIFF

              v.                        Civil No. 09-5216

CAPTAIN ROBERT HOLLY; and
SHERIFF KEITH FERGUSON                                             DEFENDANTS

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Michael David Jolley (hereinafter Jolley), filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*.

Jolley is currently incarcerated at the Cummins Unit of the Arkansas Department of Correction (ADC). The events at issue in this case occurred while he was incarcerated at the Benton County Detention Center (BCDC) from February 11, 2009, until December 15, 2009. Jolley maintains he was denied access to the Courts and subjected to unconstitutional conditions of confinement.

A motion for summary judgment has been filed on behalf of Defendants (Doc. 13). To assist Plaintiff in responding to the summary judgment motion, I propounded a questionnaire (Doc. 21). Jolley filed a timely response to the questionnaire (Doc. 22). The motion for summary judgment is now ready for disposition.

### 1.  Background

Jolley was booked into the BCDC on February 11, 2009, on a pending criminal charge. Plaintiff's Response (Doc. 22)(hereinafter Resp.) at ¶ 1. On August 7, 2009, Jolley pled guilty to the charge and was sentenced to a period of incarceration in the ADC. Id. at ¶ 3. He remained incarcerated at the BCDC until December 15, 2009, when he was transferred to the ADC.

On February 15th, Jolley asked to be placed on a list to speak to the public defender. Resp.

at ¶ 4(A).  Jolley does not know if he was placed on the list or not.  Id. at ¶ 4(B).  He was, however, represented by a private attorney paid for by his family.  Id. at ¶ 4(C).

On February 18th, Jolley asked to use the library in connection with both criminal and civil cases.  Resp. at ¶¶ 5(A) &5(H).  His request was approved on February 26th.  Id. at ¶ 5(B).  Jolley was allowed to use the law library but he maintains it was inadequate consisting of only about five law books.  Id. at ¶ 5(C).  Jolley was able to send and receive legal mail.  Id. at ¶ 5(D).  His attorney could visit him at the jail.  Id. at ¶ 5(F).  Jolley had access to a telephone.  Id. at ¶ 5(E).  He did not miss any deadlines for filing documents with any court.  Id. at ¶ 5(G).  I also note that Jolley filed this civil rights action while incarcerated at the BCDC.

Jolley requested access to the law library on the following days:  February 23rd; March 2nd; April 16th; April 19th; June 15th; June 23rd; June 25th; June 28th; June 30th; and July 13th.  Resp. at ¶ 5(I).  While each request was approved, Jolley maintains he did not always get to go to the library.  Id. at ¶ 5(J).

Jolley also complained because it was not considered legal mail when he wrote to the state police.  Resp. at ¶ 31(A).  He was told the police did not qualify as a court or an attorney.  Id. at ¶ 31(B).

On March 12th, Jolley complained that he had not received a clean jail uniform (stripes) in two weeks because they had nothing bigger than a size large.  Resp. at ¶ 7(A).  In response, Captain Petray said he would check on it.  Id. at ¶ 7(B).  Jolley indicates it still took approximately a week before he received a clean uniform.  Id.  Other than during this two week period in March, Jolley indicates there were a couple of other times when laundry was passed out and they did not have the correct size so he had to wait a "day or two."  Id. at ¶ 7(C).

On March 16th, Jolley asked to move to a different cell because the toilet in his cell was

-2-

"messed up." Id. at ¶ 8(A).  The toilet was repaired after a couple of weeks.  Id. at ¶ 8(B).    On March 26th, Jolley requested, and was given, a cotton blanket because the wool one made him itch. Resp. at ¶¶ 8(C) & 8(D).  On April 17th, Jolley asked for a hygiene shave.  Id. at ¶ 9(A).  In response, he was told to ask a pod deputy.  Id.  Jolley asserts his requests for hygiene shaves were approved but if the pod deputies did not have time he would not get to shave that day.  Id. at ¶¶ 9(B)-9(D).  On September 5th, Jolley was told the hygiene shaves were at the deputies' discretion. Id. at ¶ 9(E).  On September 6th, Jolley complained that he had been told only court shaves were being given but then two other inmates were allowed to shave.  Resp. at ¶ 9(F).  In response, he was told he had been given a shave on September 7th and that he had gotten more shaves than the average inmate.  Id. Jolley continued to periodically complain about not getting a shave and/or hair cut.  Resp. at ¶¶ 21(A), 21(F), & 29(A).

On May 19th, Jolley submitted a grievance complaining that he had to wait for toilet paper when the public restroom was out.  Resp. at ¶ 10(A).  Jolley indicated he sometimes had to wait for a long time and stated inmates were told they were using too much toilet paper.  Id.  According to Jolley, inmates were in the day-room approximately fourteen to sixteen hours a day.  Id. at ¶ 10(D). During that time, all inmates were to use the toilet in a single cell referred to as the public restroom. Id. at ¶ 10(C).

In response to the grievance, Jolley was told that the deputies would supply "per needs as time allows them too."  Resp. at ¶ 10(B).  Jolley indicated the public restroom was supplied with toilet paper regularly on some days and not on other days.  Id.  at ¶ 10(E).  Additionally, inmates were supplied with toilet paper for their cells twice a week--on Sundays and Wednesdays.  Id. at ¶ 10(F).  If he ran out, Jolley indicates he had to "borrow some from another inmate or . . . use other means."  Id. at ¶ 10(G).

-3-

On May 19th, Jolley complained that there were thirty-eight inmates in the pod. <u>Resp.</u> at ¶ 10(I). He stated this was too many inmates per toilet and that at times there were five inmates waiting to use the toilet. <u>Id</u>. In response, Jolley was told that an additional public restroom would be provided or he would be allowed to use his own cell. <u>Id</u>. at ¶ 10(J). An additional restroom was opened. <u>Id</u>. at ¶ 10(K).

On August 12th, Jolley complained about receiving toilet paper only twice a week. <u>Resp.</u> at ¶ 10(L). He said he had to use the toilet paper to blow his nose, for napkins, and to wipe up spills. <u>Id</u>. In response, Jolley was told he would receive toilet paper on Sundays and Wednesdays and that the deputies would provide cleaning supplies for spills. <u>Id</u> at ¶ 10(M).

Jolley submitted a second grievance regarding toilet paper on August 17th. <u>Resp.</u> at ¶ 10(N). He asked again why he was limited to one roll of toilet paper on Sundays and Wednesdays. <u>Id</u>. In response Jolley was told the rolls of toilet paper inmates were now receiving were two and one half times larger than the old rolls. <u>Id</u>. at ¶ 10(O). He was also told that if he was on lock-down or in administrative segregation he would be able to get toilet paper on request. <u>Id</u>. When Jolley was initially on lock-down, he indicated he would run out of toilet paper and use newspaper or jail clothing. <u>Id</u>. at ¶ 10(P). Later, he states the decision was made to supply lock-down inmates with toilet paper upon request. <u>Id</u>.

Jolley's May 27th request for copies of documents for his civil case was denied. <u>Resp.</u> at ¶ 12(A). Except when the deputies ran out, he was given paper and a pen or pencil. <u>Id</u>. at ¶ 12(B). Without paper or a pen, Jolley indicates he could not handwrite a copy of a document. <u>Id</u>. at ¶ 12(C).

There were a "few times" when Jolley did not receive a full hour of recreation out of his cell. <u>Id</u>. at ¶ 14(B). One such occasion was on June 5th. <u>Id</u>. at ¶ 14(A).

-4-

On June 26th, Jolley submitted a grievance about only getting indigent supplies (toothpaste, soap, and shampoo) once a week.  Resp. at ¶ 15(A).  He stated if he ran out he should be allowed to get additional supplies.  Id.  In response, Jolley was told that indigent supplies were provided once a week and he needed to make them last.  Id. at ¶ 15(C).  Jolley indicates there were days when he did not have soap or toothpaste because he ran out before Sunday.  Id. at ¶ 15(C).

He was allowed to shower on a regular basis.  Resp. at ¶ 15(D).  Between showers, Jolley had access to basic hygiene items such as soap and water.  Id. at ¶ 15(E).  Jolley, however, again indicates there were times when he was out of soap.  Id.

On June 27th, Jolley submitted a grievance stating that the air circulation in D-149 had not worked for two weeks.  Resp. at ¶ 16(A).  He stated it was hot and nothing was being done.  Id.  In response, Jolley was told the air conditioning had been a priority.  Id. at ¶ 16(B).  He was told individual units would be addressed.  Id. Jolley indicates it was so hot that the floors were sweating.  Id. at ¶ 16(E).

On June 28th, Jolley submitted a grievance complaining of excessive heat and asking if the doors could be left open during nap time and for awhile at night.  Resp. at ¶ 16(F).  In response, he was told the doors could not be left open.  Id. at ¶ 16(G).

On July 17th, Jolley stated both the cold water tap and the hot water tap had hot water.  Resp. at ¶ 17(A).  He asked for the cold water to be turned on.  Id.  In response, he was told maintenance would check on it.  Id.  The issue was resolved but not "right away."  Id. at ¶ 17(B).

On July 17th, Jolley submitted a grievance complaining that when he requested additional soap he was told indigents were passed out on Sunday.  Resp. at ¶ 18(A).  He stated because the air conditioner did not work he was taking three showers a day and normally took two showers a day.  Id.  He stated the bar of soap he was given was not enough.  Id.  In response, he was told the

-5-

indigents were passed out on Sunday.  Id. at ¶ 18(B).

On July 21st that the he was out of soap.  Resp. at ¶ 19(A).  He stated the number of showers he took should not be limited.  Id.  According to Defendants, Jolley's cell was searched and he had soap.  Id. at ¶ 19(B); Resp. at ¶ 19(B)(without knowledge to agree or disagree).

On July 25th, Jolley complained because he was not allowed to clean the pod anymore. Resp. at ¶ 20(A).  He stated the inmates cleaned the pod better than the trustees did.  Id.  In response, Jolley was told that trustees would now clean the pod to avoid preferential treatment.  Id. at ¶ 20(B).

On July 29th, Jolley was moved to protective custody because of "issues" with several inmates. Resp. at ¶ 21(D).  He remained in protective custody until December 15th.  Id. at ¶ 21(E).

On August 17th, Jolley complained about not getting deodorant.  Resp. at ¶ 22(A).  He stated it should be part of hygiene.  Id.  He also indicated the trustees were provided it as were the women.  Id.  In response, Jolley was told the trustees received deodorant because they worked twelve hour shifts.  Id. at ¶ 22(B).  He was told the women did not receive deodorant.  Id.

On August 24th, Jolley complained because the pod he was in usually had recreation in the mornings.  Defts' Ex. 2(B) at pg. 21; Resp. at ¶ 23(A)(without knowledge to agree or disagree).  He asked why it could not be rotated so that he had recreation in the afternoons once in awhile.  Id.  In response, Jolley was told it was hard enough to make sure everyone got recreation.  Id. at ¶ 23(B).  However, the sergeants were advised to try and rotate recreation when they could.  Id.

On August 30th, Jolley submitted a grievance stating it had been at least four weeks since he had gotten clean sheets and blankets.  Resp. at ¶ 24(A).  He asked if he would have to wash them himself in the shower.  Id.  Captain Holly (hereinafter Holly) thanked Jolley for the information and

-6-

said that Sergeant Vaughn would get the matter corrected in the next day or two.  Id. at ¶ 24(B).

Jolley did receive clean sheets within the next few days but maintains he should not have had to

wait five weeks.  Id. at ¶ 24(C).  Jolley indicates there were other occasions when he had to wait

two weeks for clean sheets.  Id. at ¶ 24(D).

On August 31st, Jolley submitted a grievance complaining that there were two mentally ill

inmates in E-102.  Resp. at ¶ 25(A).  He stated the one yelled all night and the other one defecated

in his cell.  Id.  Jolley suggested these individuals be moved to booking.  Id.  In  response, Jolley

was told the inmates would be moved when beds opened up for them at the state hospital.  Id. at

¶ 25(B).  Jolley was in the same cell block with these inmates.  Id. at ¶ 25(C).  He asserts the noise

was unbearable and he indicates he still has nightmares because of the excessive noise.  Id.

On September 2nd, Jolley requested a second cotton blanket because he stated he was cold.

Resp. at ¶ 26(A).  He indicated the cotton blankets were not as warm as the wool ones but wool

made him itch.  Id.  His request was refused.  Id. at ¶ 26(B).  Jolley indicates he did not have

sufficient clothing to stay comfortable.  Id. at ¶ 26(C).

On September 22nd, Jolley complained of sleep deprivation and exposure to a mentally ill

inmate.  Resp. at ¶ 27(A).  He said the inmate yelled all the time.  Id.  According to Defendants, the

inmate was moved in response to Jolley's request.   Defts' Ex. 2(C) at pg. 6; Resp. at ¶

27(B)(without knowledge to agree or disagree).

On September 28th, Jolley submitted a grievance stating "Mexicans and Blacks" were being

favored over "White" individuals.  Resp. at ¶ 28(A).  As an example, Jolley discussed the use of

the phone.  Id.  In response, Jolley was told there was no discrimination against Whites.  Id. at ¶

28(B).

On October 10th, Jolley submitted a grievance asking why sex offenders were not allowed

to be trustees.  Resp. at ¶ 30(A).  He was informed that sex offenders were not allowed to be trustees and that this rule was for the protection of the sex offenders.  Id. at ¶ 30(A).  If deputies were not present when he was out, Jolley was told the possibility of his getting hurt was higher.  Id. at ¶ 30(B).

On October 27th, Jolley complained some people were getting two recreation periods.  Resp. at ¶ 32(A).  He indicated this had happened several times.  Id.  Lieutenant Carter responded that inmates were allowed out of their cells whenever possible as jail operations dictated.  Resp. at ¶ 32(B).

Jolley contends Holly is liable for the violation of his federal constitutional rights because he was the "person running the jail and making the decisions."  Resp. at ¶ 34.  Similarly, he maintains Sheriff Ferguson is liable because he is "Holly's boss."  Id. at ¶ 35.  As a result of the conditions under which he was detained, specifically the yelling and excessive noise, Jolley maintains he still has frequent headaches.  Resp. at ¶ 36.

### 2.  Applicable Standard

"Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  We view all evidence and inferences in a light most favorable to the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  However, the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial.  See Celotex v. Catrett, 477 U.S. 317, 324 (1986).

### 3.  Discussion

Defendants have moved for summary judgment on both of Jolley's claims.  They present four arguments.  First, they maintain there was no denial of access to the law library or to the courts.

-8-

Second, they maintain Jolley was not subjected to unconstitutional conditions of confinement. Third, they maintain there is no evidence of any unconstitutional county policy. Finally, they argue Jolley has suffered no physical injury.

### *Access to the Court*

Detainees have no "freestanding right to law library access or trained legal assistance." Bourdon v. Loughren, 386 F.3d 88, 92 (2d Cir. 2004)(citation omitted). Instead, "[i]nmates undeniably enjoy a constitutional right of access to the courts and the legal system." Myers v. Hundley, 101 F.3d 542, 544 (8th Cir. 1996)(citing Lewis v. Casey, 518 U.S. 343 (1996); Bounds v. Smith, 430 U.S. 817 (1997)). The right of access requires the provision of "prisoners with adequate law libraries or adequate assistance from persons trained in the law," Bounds, 430 U.S. at 828, to challenge their criminal charges, convictions, and sentences directly or collaterally or to challenge the conditions of their confinement through civil rights actions, Lewis v. Casey, 518 U.S. at 351. See also Cody v. Weber, 256 F. 3d 764, 767-68 (8th Cir. 2001)("right of access to the courts guarantees an inmate the ability to file lawsuits that directly or collaterally attack the inmate's sentence or that challenge the conditions of the inmate's confinement, but it does not extend to the right to 'discover grievances' or to 'litigate effectively once in court'")(quoting Lewis, 518 U.S. at 354-55).

I find Defendants are entitled to summary judgment on this claim. First, Jolley is not entitled to both the provision of an adequate law library and to the assistance from persons trained in the law. The right of access to the courts requires the provision of one or the other--not both. See e.g., Johnson-El v. Schoemehl, 878 F.2d 1043, 1052 (8th Cir. 1989)("The City must provide its pre-trial detainees **either** with 'adequate law libraries or adequate assistance from

AO72A
(Rev. 8/82)

persons trained in the law'")(quoting Bounds, 430 U.S. at 838)(emphasis added).   The

appointment of counsel has been recognized as a "valid means of satisfying a prisoner's right of

access to the courts." Bourdon, 386 F.3d at 93.  See also Storseth v. Spellman, 654 F.2d 1349,

1353 (9th Cir. 1981)("Appointed counsel, whether state or court provided, offers a meaningful,

and certainly the best, avenue of access to an indigent inmate").

     Second, the cases establish that there is a distinction between the term "adequate

assistance by persons trained in the law" as used in Bounds and the term ineffective counsel as

used in Sixth Amendment right to counsel cases.  In Bourdon, the court discussed this distinction

and stated:

> [b]ecause attorneys, by definition, are trained and qualified in legal matters, when
> a prisoner with appointed counsel claims that he was hindered by prison officials
> in his efforts to defend himself or pursue other relevant legal claims, he must
> show that, on the facts of his case, the provision of counsel did not furnish him
> with the capability of bringing his challenges before the courts, not that he was
> denied effective representation in the court.

Bourdon, 366 F.3d at 98.  "[T]he term 'adequate' as used in Bounds to modify 'assistance from

persons trained in the law,' refers not to the effectiveness of the representation, but to the

adequacy of the prisoner's access to his or her court-approved counsel or other law-trained

assistant." Schrier v. Halford, 60 F.3d 1309, 1313-14 (8th Cir. 1995).  In this case, Jolley does

not contend that his access to his counsel was hindered in anyway.

     Finally, Jolley's claim fails because he suffered no actual injury.  The right of access to

the courts is not an abstract one and the inmate must "demonstrate that the alleged shortcomings

. . . hindered his efforts to pursue a legal claim." Lewis, 518 U.S. at 351.  See also Hartsfield v.

Nichols, 511 F.3d 826, 832 (8th Cir. 2008)(Hartsfield failed to allege he was prevented from

filing a complaint, or a filed complaint was dismissed for lack of legal adequacy.  He only

roughly and generally asserted that he was prevented from filing because he did not know what arguments to make.   This claim is speculative and was properly dismissed); <u>Klinger v. Department of Corrections</u>, 107 F.3d 609, 617 (8th Cir. 1997) (to prevail on access-to-courts claim, inmate must show actual injury or prejudice even if denial of access to library is complete and systematic).  Jolley indicated he did not miss any deadlines for filing documents with a court. <u>Resp</u>. at ¶ 5(G). There is nothing to suggest his claims were dismissed for lack of legal adequacy or that he was in some manner prevented from filing an appeal, request for post-conviction relief, or a civil rights action.

### *Conditions of Confinement*

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." <u>County of Sacramento v. Lewis</u>, 523 U.S. 833 (1998)(citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. <u>See Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994).   In this circuit, the deliberate indifference standard of the Eighth Amendment applies to all claims that prison officials failed to provide adequate food, clothing, shelter, etc., whether brought by pretrial detainees or convicted inmates. <u>Butler v. Fletcher</u>, 465 F.3d 340, 345 (8th Cir. 2006).

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment.  U.S. Const. amend. VIII.   The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981).

-11-

A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element.  See Revels v. Vincenz, 382 F.3d 870, 875 (8th Cir. 2004)(citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities.  The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner"  Revels, 382 F.3d at 875 (citations and internal quotation marks omitted).  Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety."  Id.  The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society."  Estelle v. Gamble, 429 U.S. 97, 102 (1976).

Keeping these principles in mind, I turn to an examination of the conditions of confinement alleged to exist in this case. Jolley has a litany of objections about his conditions of confinement.  These include:  not receiving a clean jail uniform in March for two to three weeks because none were available in his size; the toilet in his cell sticking sometimes; not getting hygiene shaves as often as he would like; having to wait for toilet paper to be supplied in the public restroom; only being supplied with toilet paper for his cell twice a week; thirty-eight inmates having to use one public restroom; not being provided with copies of documents; not getting his full hour out for recreation a few times and usually having recreation in the mornings rather than the afternoon; only getting indigent supplies (toothpaste, soap, and shampoo) once a week; the air circulation not working for several weeks causing hot temperatures in the cells; for a while the cold water tap produced hot water; the bar of soap he was given weekly was insufficient because he was

-12-

taking two or three showers a day; not getting deodorant; not getting clean sheets and blankets on one occasion for five weeks and other times having to wait two weeks for clean sheets and blankets; being housed in the same pod with a mentally ill inmate who yelled all night and another who defecated in his cell; not being provided a second blanket when he was cold; and not being able to sleep because of the inmate yelling all the time.

Many of Jolley's complaints deal with Jolley's ability to maintain personal hygiene: indigent supplies; hygiene shaves; deodorant; clean bedding; clean clothing; the availability of toilet paper.  To violate the Eighth Amendment requires Defendants to deprive Jolley of a "single, identifiable human need." Wilson v. Seiter, 501 U.S. 294, 304 (1991).  In this case, Jolley was provided with hygiene items on a regular basis.  He was allowed to shower on a regular and frequent basis sometimes showering three times a day.  With the exception of a few times, he was provided with clean clothing and clean bedding, although there were few occasions when he had to wait days or even weeks for the items to be provided.  In this regard I note, Jolley was able to maintain his personal hygiene.  Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." Revels, 382 F.3d at 875.  The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102 (1976).  "Conditions of confinement, however, constitute cruel and unusual punishment 'only when they have a mutually enforcing effect that produces deprivation of a single, identifiable human need such as food, warmth, or exercise." Whitnack v. Douglas County, 16 F.3d 954, 957 (8th Cir. 1994)(quoting, Wilson v. Sieter, 501 U.S. 294 (1991)).  The conditions identified by Jolley are clearly insufficient.

-13-

Next, Jolley indicates the jail was not kept at a comfortable temperature.  On June 27th, and June 28th, he complained of excessive heat because the air circulation had not been working for two weeks.  Resp. at ¶¶ 16(A) & 16(F).  This problem was being addressed by detention center personnel.  Id. at 16(B).   Although he continued to submit grievances on a regular basis on a variety of topics, Jolley did not again mention excessive heat.  In fact, Jolley's next complaint about the temperature within the facility was made on September 2nd when he asked for a second blanket because he was cold.  Id. at ¶ 26(A).  No other requests or grievances were submitted concerning the temperatures within the facility.  While the Eighth Amendment protects inmates from being subjected to extremely hot or cold temperature, there is no basis in this case on which to find that the temperatures rendered the jail conditions cruel and unusual or that they contravened contemporary standards of decency.  The deprivations Jolley alleges were of limited duration and are not sufficiently serious to implicate the Eighth Amendment.

Jolley also complains about being housed in the same pod with mentally ill inmates.  Resp. at 25(A).  He indicated the one inmate yelled all night making the noise level unbearable.  Id.  As a result, Jolley asserts he became sleep deprived.  Id. at ¶ 27(A).  When Jolley submitted a grievance stating he was sleep deprived because the inmate yelled all the time, Defendants responded by moving the inmate.  Defts' Ex. 2(C) at pg. 6;  Resp. at ¶ 27(B)(without knowledge to agree or disagree).

Whether considered individually, or in the totality of the circumstances, the conditions of confinement alleged to exist by Jolley are not sufficiently harmful to evidence deliberate indifference to Jolley's needs.  The conditions comport with contemporary standards of decency.  Rhodes v. Chapman, 452 U.S. 337 (1981).

-14-

**4.  Conclusion**

For the reasons stated, I recommend that the motion for summary judgment (Doc. 13) be granted and this case dismissed with prejudice.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 2nd day of March 2011.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-15-